Filed 6/26/14  Resurreccion v. City of Los Angeles CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ROBERT RESURRECCION, | B250539 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS138090) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Michael N. Feuer, City Attorney, Carlos De La Guerra, Managing Assistant City Attorney, Wayne H. Song, Supervising Deputy City Attorney, and Yong W. Sohn, Deputy City Attorney, for Defendants and Appellants.

Silver, Hadden, Silver, Wexler & Levine, Susan Silver and Jacob A. Kalinski for Plaintiff and Respondent.

————————————

Respondent Robert Resurreccion, a member of the Los Angeles Police Department (LAPD), was terminated after a Board of Rights (Board) found him guilty of selling a firearm without using a licensed firearms dealer, in violation of Penal Code section 12072, subdivision (d).[1]  Resurreccion petitioned for a peremptory writ of mandate pursuant to Code of Civil Procedure section 1094.5, which the trial court granted, ordering appellants the City of Los Angeles and its chief of police (together, the City) to set aside the termination, revisit the matter and impose a penalty less severe than termination.  The City appeals, contending the trial court improperly substituted its own evaluation that the disciplinary penalty imposed against Resurreccion was too harsh for the offense he committed.  We conclude the Board abused its discretion in imposing an excessive penalty, and affirm the judgment.

## FACTUAL BACKGROUND

*Events leading to Resurreccion's termination*

As of May 2010, Resurreccion had been an LAPD Officer for approximately four and a half years.  He was assigned to the 77th Street station.  Resurreccion was interested in selling his personal Glock 22 (the handgun).  Although Resurreccion had purchased several weapons in the past—at least two of which were acquired through a licensed dealer after undergoing a background check—he had never before sold one.

Resurreccion was acquainted with Mario Medina, a cadet at the station; they met in January 2010.  Resurreccion characterized his relationship with Medina as that of an "acquaintance" or "friend that [he] met at the station . . . ."  They spoke on the phone, but did not otherwise socialize.[2]  Resurreccion viewed Medina as "a hard working guy," "a

---

[1] Penal Code section 12072, subdivision (d) was recodified in 2010 as section 27545 as part of the Deadly Weapons Recodification Act of 2010, operative January 1, 2012.  For the sake of clarity, we, like the parties and trial court, shall continue to refer to section 12072.

[2] At one point, Resurreccion told LAPD investigators he and Medina "had developed a close personal friendship."  Medina also told investigators he had met Resurreccion about two years ago and "they became friends."

2

real good kid," and "a go getter." Medina overheard Resurreccion say he wanted to sell his handgun, and asked about buying it. Resurreccion knew Medina was 19 years old.

At first, Resurreccion believed it was legally permissible for him to sell the handgun to Medina. It was his understanding that "side arms" (such as the handgun) could be sold to someone over 18 years of age, but that it was unlawful to sell a rifle or shotgun to anyone under 21. After talking to co-workers, however, Resurreccion understood that the reverse was true, i.e., that a side arm could not be sold to someone under 21 (but that a shotgun or rifle could be), so he told Medina he could not sell him the handgun. Resurreccion never consulted a supervisor or attorney to ensure that his information was correct.

Medina told Resurreccion he could sell the handgun to his brother, Danny Posada, who was over 21. In fact, Posada was not Medina's brother. A few weeks later, Resurreccion sold the handgun to Posada for $370. Resurreccion believed he was selling the handgun to Posada, with whom he intended to carry out a proper transaction. Resurreccion knew, however, that the money for the purchase came from Medina.[3] Resurreccion delivered the disassembled handgun to the trunk of Medina's car, and received the agreed upon cash payment from Medina. Resurreccion advised Posada, who was sitting inside the car, that they would have to complete the paperwork for the transfer later. Resurreccion had met Posada before, but never inquired about or verified his age, identity or background before turning over the handgun to him.[4] Resurreccion did tell Posada to register the handgun in his name.

---

[3] In interviews conducted by the LAPD, both Posada and Medina said Posada took control of the handgun after the purchase. Medina said the plan was that Posada would register the handgun in his name until Medina turned 21, at which point he would transfer the handgun and registration to Medina.

[4] Posada was 21 at the time, not a convicted felon, and therefore eligible to purchase a firearm. He was not Medina's brother.

*Medina's arrest*

As of June 25, 2010, Medina was suspended from the Cadet Program for unspecified misconduct and barred from the 77th Street station. On this date, however, Medina was seen in the station's lobby. When the officer working the front desk told Medina to leave, Medina asked him to retrieve his gym bag from behind the desk. The officer did and, because the bag felt suspiciously heavy, asked Medina for permission to search the bag. Medina consented. Inside the officer found the fully-loaded handgun, ballistic and tactical vests, handcuffs, shot gun ammunition, a tactical flashlight, and a Surefire rail mount assembly for a Glock handgun. Medina was arrested for illegal firearms possession. After his arrest, two stolen sets of keys to LAPD vehicles were recovered from Medina's pants pocket. The handgun was still registered to Resurreccion. No other item in Medina's possession at the time of his arrest was obtained from Resurreccion. Misdemeanor criminal charges were filed against Medina for possession of a loaded handgun and vehicle tampering. He pleaded guilty to vehicle tampering (Veh. Code, § 10852), and the remaining charge was dismissed. A criminal investigation was initiated against Resurreccion for an illegal firearm transaction, but both the district attorney and city attorney declined to file criminal charges.

*Administrative proceedings*

    a.    *Resurreccion's testimony*

In October 2011, Resurreccion was referred to the Board hearing[5] with a proposed penalty of removal from his position as an LAPD officer. He was charged with one count of misconduct. Specifically: "Between April 2010 and May 2010, you, while off duty, failed to complete the sale of a firearm through a licensed firearms dealer."

---

[5] The Board hearing is an administrative disciplinary proceeding composed of three members (two command staff officers, at the level of captain or above, and one civilian). They serve as the triers of fact and make penalty recommendations to the Chief. (See Los Angeles City Charter § 1070(h), (n).)

4

The hearing was conducted in March 2012. At the outset, Resurreccion conceded guilt as to the charged count. He testified that he did not use the services of a licensed gun dealer in connection with the sale of the handgun because he did not, at the time, realize the seriousness of the situation. He believed he had done the right thing by ensuring he did not sell the handgun to a person under 21. Had he realized the potentially grave consequences of his uninformed actions, he would have completed the sale through a dealer. Resurreccion never intended to do anything malicious or to break the law; he thought he "was doing everything correctly," and following "the proper procedure." He always understood he had to do the proper paperwork; he just did not do it soon enough. In retrospect, he realized that he should have conducted an inquiry. He testified that he is, or at least at the time of this incident was, "a real trusting person." This experience has taught him to be more cautious, and that he cannot make decisions based on "his gut[] instinct because [he] feel[s a] person is . . . trustworthy. . . ." Resurreccion gave the Board examples of situations he had encountered since the sale of the handgun to illustrate how he had used this experience as a learning opportunity. Even though it had been embarrassing and had damaged one friendship, Resurreccion used what he learned from this experience to try to ensure that no one else made a mistake similar to the one he made regarding the gun sale to Medina.

Based on the evidence and Resurreccion's admission of guilt, the Board found him guilty as to the charged count.

*b.* *Character evidence and commendations*

Sergeant Juan Sanchez, who had been with the LAPD for 25 years, was Resurreccion's supervisor for about one year at the 77th Street station. He testified that it was a pleasure to supervise Resurreccion, who is the sort of officer who makes a Sergeant's job easier. Resurreccion was "always . . . willing to go the extra mile," and his service to the community was "very, very professional." Sergeant Sanchez never had any reason to question Resurreccion's integrity. He believed Resurreccion was an officer who would learn from this and other mistakes, and would never find himself in a similar position. When asked if he would have any reservations taking Resurreccion back under

5

his supervision after this incident, Sergeant Sanchez said he'd take Resurreccion back "in a heartbeat."

At the time of the hearing, Lieutenant Peter Casey had worked for the LAPD for 21 years, and a supervisor for 14. Lieutenant Casey always declined requests to serve as a character witness at Board hearings. But he agreed to testify on Resurreccion's behalf because Resurreccion "absolutely deserves and has earned" the right to have him "come down . . . and say why he is such an outstanding officer, because he truly is an outstanding officer." Except for a gap from 2009 to 2010, Lieutenant Casey was Resurreccion's supervisor from July 2007 through 2011. Resurreccion's talent and motivation were obvious from the outset, and early on he was assigned to a high crime area. He always got the job done and never complained about an assignment, nor were there any complaints about Resurreccion on any mission to which he was assigned. Other officers at the 77th Street station with whom Lieutenant Casey had spoken shared his assessment of Resurreccion as an officer. Like Sergeant Sanchez, Lieutenant Casey believed Resurreccion had learned from this incident and that nothing like this would happen again. And, like Sergeant Sanchez, Lieutenant Casey said he would take Resurreccion back under his supervision without reservations; indeed, he would love to have him work for him.

The parties stipulated that five more LAPD sergeants would also testify, in essence, that he or she had supervised Resurreccion at the 77th Street station and had found him to be a conscientious, hard-working and well-respected officer. No supervisor had encountered any issue with regard to Resurreccion's credibility, integrity or dedication to the job. Each would testify that if, after a penalty was given, Resurreccion were permitted to return to the station, he or she would absolutely love to have him come back and work for him or her as a subordinate. Each supervisor viewed Resurreccion as an officer who learned from his mistakes and believed that he would not make the same mistake twice.

A Board member read into the record portions of Resurreccion's personnel history describing numerous commendations he had received as an LAPD officer. They

included commendations for Resurreccion's attention to duty, tactical skills, excellent investigative skills, exceptional work ethic and other contributions as part of crew task forces. Resurreccion's personnel history also reflected that in numerous workplace evaluations, he received ratings of "greatly exceeds standards" in several categories and was praised for his productivity and work ethic. There were notes of appreciation and praise from several supervisors. Resurreccion's personnel record contained 14 commendations for which the common theme was his excellent productivity, and that he had responded to and taken off the streets, some type of violent criminal. Resurreccion also presented evidence of numerous commendations and awards, and his exemplary record of service as a Sergeant in the Marine Corps, from which he had been honorably discharged before joining the LAPD.

        *c.*      *Lesser penalties imposed on other officers for similar misconduct*

At the hearing, Resurreccion introduced a document entitled "Disciplinary Penalties resulting from complaints closed during March 2011." That document reflects that six other members of the LAPD—five officers and a sergeant—also conducted illegal sales or loans of firearms in violation of Penal Code Section 12072, subdivision (d).[6] As a penalty for that misconduct, each of those officers received nothing more severe than an official reprimand.

        *d.*      *Board's findings and penalty imposed*

At the conclusion of the hearing, the three Board members unanimously found Resurreccion guilty of the sole count alleged against him, based on his admission of guilt. The Board was also unanimous in its conclusion that Resurreccion's testimony had been honest and forthright, and that his actions had not been undertaken with malicious intent.

---

[6] The sergeant unlawfully sold two firearms. The trial court's statement of decision refers to two officers having received reprimands for illegal firearms sales, and two others for unlawfully loaning firearms, in violation of Penal Code section 12072, subdivision (d). There is no explanation for this discrepancy between the report in the administrative record and the statement of decision.

Rather, he simply made an honest mistake, without understanding the potential consequences of his actions. Had Resurreccion understood the consequences, the Board was sure he would have made different choices. The majority of the Board also found that Resurreccion had shown questionable judgment by involving a cadet in the sale of a firearm, and poor judgment by selling a firearm to an acquaintance without first verifying his age or background.

The three-member Board split, however, as to the appropriate penalty to impose. The majority concluded that Resurreccion's retention "would send a conflicting message regarding the values and expectations" the LAPD demanded from all of its officers. The two sworn LAPD Board members recommended that Resurreccion be terminated.

The civilian Board member disagreed. That member opined that termination was a disproportionate penalty for the misconduct at issue, as this was not one of the most serious cases. Further, numerous other officers who engaged in similar misconduct had received only a reprimand as punishment. This Board member recommended a penalty of, at most, a 10-day suspension.

Chief Beck accepted the majority's recommendation and issued an order terminating Resurreccion's employment.

*Trial court proceedings*

Resurreccion filed a petition seeking a peremptory writ of mandate. (Code Civ. Proc., § 1094.5.) The trial court found "the penalty of termination imposed on [Resurreccion] was excessive and a clear abuse of discretion." The court granted the petition, and remanded the matter to the Board for reconsideration and imposition of a lesser penalty not to include discharge. The City filed this timely appeal.

**DISCUSSION**

1.    *Standard of review*

In a mandamus proceeding regarding a penalty imposed by an administrative agency, we review the agency's determination de novo to ascertain whether it abused its discretion. (*Haney v. City of Los Angeles* (2003) 109 Cal.App.4th 1, 11 (*Haney*).) In considering whether an abuse occurred in the context of public employee discipline, the

8

court must examine the extent of the harm to public service, the circumstances surrounding the misconduct and the likelihood that such conduct will recur. (*Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 217–218 (*Skelly*).) According to the California Supreme Court, "'the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, "[h]arm to the public service." [Citations.]'" (*Haney*, at p. 11.)

2.      *On this record, the penalty of discharge was excessive*

The City maintains the trial court erred and imposed its own judgment that the penalty of termination of employment was too harsh for Resurreccion's admitted misconduct. We disagree.

The Board found Resurreccion guilty of a single count of misconduct, based on his unequivocal admission that he failed to complete the sale of a firearm through a licensed firearms dealer. Resurreccion sold the handgun to an unknown person, whom he believed to be Medina's 21-year old brother, but never verified the buyer's age or relationship with the cadet. Further, Resurreccion knew that 19-year-old Medina wanted to purchase the handgun and was unable lawfully to do so. Nevertheless, Resurreccion accepted a cash payment for the weapon from Medina himself.

The Board unanimously agreed that Resurreccion was "honest and forthright in his testimony" and acted out of ignorance, not with malicious intent. All three members of the Board agreed Resurreccion "simply believed that he made an honest mistake and did not understand the consequences of his actions at that time," and that if he had "understood them, [they were] confident [Resurreccion] would have pursued other options."

In recommending termination of employment, the majority of the Board found that Resurreccion had "violated the law Enforcement Code of Ethics," and had been "involved in behavior that could be considered criminal in nature and undermines the integrity of the police profession." The majority further noted that Resurreccion's misconduct was "extremely serious in nature," a "neglect of duty" and demonstrated poor judgment. Specifically, someone in Resurreccion's position who did not know the

9

appropriate procedure to legally transfer a weapon should have asked a responsible person, should not have involved a cadet in the sale, and should not have made the sale without verifying the buyer's age and background. Although it was "the most difficult decision" it had made in its 48 collective years of law enforcement, the majority recommended that Resurreccion—whom it noted had "demonstrated an outstanding work ethic and professional demeanor" during his tenure with the LAPD—be terminated because retaining him "would send a conflicting message about the values and expectations" demanded of LAPD officers.

The dissenting Board member opined that termination was a disproportionate punishment in light of the fact that (1) this was Resurreccion's first act of any sort of misconduct in a previously exemplary record of service, and that every supervisor who testified on his behalf was eager to have him back as a subordinate; (2) there was evidence numerous other employees had been punished far less severely for the same misconduct; and (3) although serious consequences could have resulted from Resurreccion's conduct, none had, and he should be disciplined only on the basis of what did occur, not on what might have happened. According to the LAPD manual, termination was reserved for the very worst offenses, a category which, in the minority Board member's opinion, did not include Resurreccion's misconduct.

To support its decision that termination was an appropriate penalty, the majority of the Board relied in part on section 210.20 of the LAPD manual, which concerns an officer's duty to act with integrity and to be honest.[7] Critically, the Board unanimously agreed and specifically found that Resurreccion had testified honestly and acted without malicious intent. It concluded he was simply ignorant of the law and was guilty only of exercising poor judgment and of making an honest mistake. Thus, the City's reliance on

---

[7] Specifically, section 210.20 of the LAPD manual states: "'The public demands that the integrity of its law enforcement officers be above reproach, and the dishonesty of a single officer may impair public confidence and case suspicion upon the entire [LAPD]. An officer must scrupulously avoid any conduct which might compromise the integrity of himself, his fellow officers, or the Department.'"

*Hooks v. State Personnel Bd.* (1980) 111 Cal.App.3d 572, is misplaced. *Hooks* involved a correctional officer terminated for illegal possession of narcotics. (*Id.* at p. 575.) Although both Resurreccion and the plaintiff in *Hooks* were officers guilty of violating the law, the similarities end there. In *Hooks*, there was no question that the officer knew it was illegal to possess narcotics, and no indication that he raised ignorance or mistake of law as a defense. (*Id.* at p. 579.) Here, the Board expressly found that Resurreccion made an honest mistake of law and did not know he had sold the handgun in an unauthorized manner.

We also agree with the trial court's conclusion that Resurreccion never violated section 210.20 of the LAPD manual (an act which was also not alleged against him) through dishonesty or a compromise of his integrity. "'Integrity' is the strict adherence to a code or standard of values. [Citation.] A breach of integrity requires intentional misconduct. One cannot breach a standard of values through an honest mistake." The Board's reliance on section 210.20 of the LAPD manual to justify a penalty of termination was misplaced.

The "overriding consideration" in cases involving administrative discipline, "is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence. [Citation.]" (*Skelly*, *supra*, 15 Cal. 3d at p. 218.) We agree with the City and the trial court that public service suffers when a police officer, tasked to uphold the law, unlawfully transfers a weapon. Police officers should be subject to discipline for committing unlawful conduct. And as for a police officer who, like the officer in *Hooks v. State Personnel Bd.*, *supra*, 111 Cal.App.3d 572, exhibits behavior that shows that he lacks respect for laws he is charged with enforcing, dismissal may be appropriate. Here, however, we agree with the trial court that Resurreccion's innocent state of mind and good faith but misguided intention to try to follow the law, and his genuine remorse, must be taken into account in assessing a reasonable penalty for his sole act of work-related misconduct.

11

Further, with regard to the question of whether this mistake will be repeated, the evidence was undisputed that the likelihood of such a recurrence is virtually nonexistent. The Board agreed that Resurreccion understood the gravity of his actions, and was honest in his testimony that he had learned from and would never repeat the same mistake. Indeed, he testified he had made a concerted effort to use this experience to educate others so they would not suffer similar consequences, and had even done so at the cost of the potentially losing the long-term friendship of a fellow Marine. With the sole exception of the sale of the handgun, Resurreccion has an exemplary record of service, both as a member of the armed forces and during his tenure with the LAPD. He stood out early in his career at the LAPD as an exceptionally promising officer and, before this incident, had no disciplinary history. Seven supervisors uniformly agreed Resurreccion was an officer who learned from his mistakes, and that no similar incidents would occur. Each would readily accept Resurreccion back into his or her chain of command without hesitation. This factor militates strongly in Resurreccion's favor.

We also agree that other circumstances surrounding the misconduct militate in Resurreccion's favor. Resurreccion presented evidence that at least four other officers had engaged in firearm sales in violation of Penal Code section 12072, subdivision (d), and two others illegally loaned firearms. None of those officers received discipline any more severe than a reprimand. The precise circumstances surrounding the other incidents of unlawful sales or loans of firearms are unknown. Nevertheless, the fact remains that, at about the same time Resurreccion sold the handgun, six officers received only reprimands for engaging in misconduct equivalent to that which ended Resurreccion's career.[8] While Resurreccion has not shown the other officers' conduct was necessarily on par with his, the City also offered no evidence to demonstrate that the other officers'

---

[8] We do not know the personnel records of the other six officers. However, we do know that Resurreccion's personnel record was virtually spotless.

conduct—which on the surface appears to be the same as Resurreccion's—was in any way distinct.

Further, as the trial court observed, the very existence of several contemporaneous cases of the same misconduct is "evidence of a systemic problem in the [LAPD's] education of its officers.  The general public confusion surrounding handgun sale requirements, coupled with the number of LAPD officers disciplined for illegal firearm sales, suggests that the [LAPD] does not adequately inform its officers about what to do when they want to privately sell a firearm."  Although the Board expressed its concern that Resurreccion's retention would send a conflicting message about the LAPD's expectations for its officers, the trial court found, and we agree, that Resurreccion "should not be made a scapegoat for a systemic failure in LAPD officer education." Rather, any "'message' which the [LAPD] wishes to convey first should be delivered to police officers through training, and only when that training fails through a serious disciplinary action such as discharge."

Under the unique circumstances of this case, we agree with the trial court that this "case presents one of the very rare instances where the court must overturn an agency's penalty because the [LAPD] committed a manifest abuse of discretion . . . ."  The penalty was excessive.  The matter must be remanded to the Board for reconsideration and imposition of discipline short of discharge.

**DISPOSITION**

The judgment is affirmed.  Costs are awarded to Robert Resurreccion.

NOT TO BE PUBLISHED.


                                          JOHNSON, J.


We concur:


         CHANEY, Acting P. J.


         WILEY, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.